**In re JUDICIARY TOWER ASSOCIATES, Debtor.**

**David B. TATGE, Trustee, Plaintiff,**

**v.**

**James P. CHANDLER, et al., Defendants.**

**Bankruptcy No. 90–00297.
Adv. No. 90–0140.**

United States Bankruptcy Court,
District of Columbia.

July 12, 1994.

James P. Chandler and Charles Ware, for defendants James P. Chandler and Robert J. Harper.

William G. Schaffer and Reg J. Lormon, for defendant George E. Bramlett.

Gary Rosen, for defendants Paul J. Riccuiti and C. Robert Buchanan.

Philip J. Jones, for defendant Bernhard J. Bucheit, Jr.

## MEMORANDUM OPINION REGARDING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

David B. Tatge, the Trustee in this Chapter 7 case, filed this adversary proceeding pursuant to Bankruptcy Code section 723(a) against various partners and former partners in the debtor partnership. The Trustee seeks contribution from the defendants for the deficiency in estate assets to pay those claims on which the respective defendants are personally liable.

The court currently has before it the Plaintiff's two motions for partial summary judgment, seeking judgment for the amount of the allowed claims of Jos. Bucheit & Sons Co., Inc. ("Bucheit & Sons"), Suburban Glass Company ("Suburban Glass"), and Quinn, Ward and Kershaw ("QWK"). Each of these claims is based on a judgment entered by the courts of the District of Columbia or Maryland. The Trustee therefore contends that the issue of liability as to these claims is settled by the principles of claim preclusion and issue preclusion, and argues that there are no disputed material facts that would prevent the granting of summary judgment against the liable partners as to each of these claims. The Trustee also seeks judgment on account of several smaller claims on which there are no prior judgments.

### I. STANDARD FOR SUMMARY JUDGMENT

The court's recent enunciation of standards for granting summary judgment in *Dicello v. Jenkins*, 160 B.R. 1 (Bankr.D.D.C.1993), is adopted here and will not be restated in this text.

### II. FACTUAL BACKGROUND

The Trustee has filed a Statement of Material Facts To Which No Genuine Issue Exists. The defendants have filed various pleadings recounting the salient facts from

their points of view, and voluminous exhibits have been submitted by the parties. Although the defendants contend that there are material facts in dispute, a close reading of the pleadings and materials filed by the parties show that there are few disputes as to the material facts, and many disputes as to the legal conclusions to be derived from those facts. Disputed material facts will be noted below as they become relevant to the analysis.[1]

Facts pertaining to the individual claims as to which the Trustee seeks contribution are addressed in individual sections below. The undisputed facts as to the partnership in general include the following:

The debtor, Judiciary Tower Associates, is a District of Columbia general partnership formed in 1982 for the purpose of acquiring commercial property at 450 H Street, N.W., in Washington, D.C., and constructing a commercial office tower at that location. The initial partners, and their percentage interests, were: James P. Chandler, 48%; Bernhard Bucheit, 20%; Robert J. Harper, Sr., 10%; C. Robert Buchanan, 10%; Paul J. Ricciuti, 10%; James Martin, 1%; and George E. Bramlett, 1%.

The partnership agreement called for acquisition of the land from James Chandler for $1,468,000. It also provided for a fixed price construction contract from Bucheit & Sons in the amount of $2,225,000, and for $40,000 in architectural fees to Buchanan and Ricciuti.

The purchase of the land was consummated, with Chandler receiving $468,000 in cash and notes for $1 million. Construction then began, but disputes arose and in 1985 Bernhard Bucheit sold his partnership interest to the remaining partners for $8,500.00, and Bucheit & Sons stopped working on the office building. The partnership then hired other construction companies to finish the building.

George Bramlett was a 1% general partner in the debtor when it was formed in 1982. On June 20, 1985, when Bucheit withdrew from the partnership, Bramlett became a 1.25% partner. On October 14, 1985, George Bramlett withdrew from the partnership and conveyed his 1.25% interest in the partnership to Chandler, increasing Chandler's interest to 61.25%.

In their pleadings, Buchanan and Ricciuti assert that they withdrew as partners, obtaining releases from some or all liability. However, they have offered absolutely no evidence from which a finder of fact could conclude that there was ever an effective withdrawal. All that the evidence shows is a history of negotiations between Buchanan, Ricciuti and Chandler which did not result in an agreement because Buchanan and Ricciuti demanded a release that Chandler was unwilling to provide. Buchanan and Ricciuti did at one point attempt to accept an offer made by Chandler, but that offer had been expressly contingent on acceptance within a certain time frame, which had elapsed prior to the attempted acceptance. According to all of the evidence presented, there was never a meeting of minds, never an open offer that was accepted. Thus, the contention that Buchanan and Ricciuti are not liable for certain claims on account of their withdrawal from the partnership must be rejected.

## III. *ELEMENTS OF SECTION 723(a)*

Bankruptcy section 723(a) provides: If there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner for the full amount of the deficiency.

Whether a general partner is personally liable on a claim is not determined by the Bankruptcy Code, but by the relevant state law. *In re CS Associates,* 160 B.R. 899, 907 (Bankr.E.D.Pa.1993); *In re Miramar Mall Limited Partnership,* 152 B.R. 631, 633 (Bankr.S.D.Cal.1993). Because the debtor is a District of Columbia partnership, we must look to D.C. law to determine which partners are liable for which claims.

---

1. Many allegedly disputed facts are supported by no evidence or affidavits in the record, but are simply asserted by attorneys to the parties through their pleadings.

As a preliminary matter, several defendants have argued that the complaint must be dismissed because there are assets in the bankruptcy estate which may exceed the amount of the claims ultimately allowed. Regardless of whether there was any merit to this contention when the complaint was filed, there is none today. The claims against the bankruptcy estate have been liquidated and allowed or disallowed (except for one claim still being litigated). The assets of the bankruptcy estate alluded to by the defendants are a malpractice action against Quinn, Ward & Kershaw, a suit against the bonding company for Bucheit & Sons, and a suit against Bucheit & Sons. The cause of action against Quinn, Ward & Kershaw has been settled by the Trustee, as discussed below. The cause of action against Bucheit & Sons has little or no value because it apparently is barred by res judicata. The claim against Bucheit & Sons's bonding company is also of questionable value, because that company is itself bankrupt. There is no reasonable basis to believe that these assets can total anywhere near the amount of the allowed claims against the estate, and so these potential assets raise no defense to liability on the Trustee's action. *See Bell & Beckwith,* 112 B.R. 863, 869 (Bankr.N.D.Ohio 1990); *CS Associates,* 160 B.R. 899, 909–10. The court will hold a hearing to determine the value that these assets have for the estate in order to quantify the amount of liability.

■ Finally, Bramlett contends that the debtor is not the same partnership in which he was a general partner, and that he is therefore not a "general partner of the partnership." Bramlett asserts that liability under section 723(a) does not extend to former general partners in the debtor, only to current general partners. The parties have not

cited, nor has this court found, any precedent on this question.[2]

The statutory language is that as to the deficiency in estate assets to pay "all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner ..." This language is ambiguous on the question posed. Among the ambiguities, section 723(a) does not refer to a case "in which a partnership is the debtor," nor does it limit itself to claims "with respect to which a general partner of the debtor is personally liable." It is unclear whether the phrase "concerning a partnership" in section 723(a) modifies "all claims ..." or whether it modifies "case under this chapter." Clearly, the claims asserted against Bramlett, even if viewed as claims against the partnership which was the debtor's predecessor, are "claims ... concerning a partnership and with respect to which a general partner of the partnership is liable."

The plain language of section 723(a) therefore does not determine this issue. Section 723(a) does not limit itself to current general partners, nor does it explicitly include former ones. However, where state law provides that a former general partner is personally liable on a claim (see D.C.Code § 41–135(a)), that former general partner would seem to fall within the ambit of the statute. Moreover, this reading is consistent with the fact that the partnership's right to seek contribution against a former general partner is property of the bankruptcy estate under section 541(a). *See In re The Ridge II,* 158 B.R. 1016, 1023 (Bankr.C.D.Cal.1993) (section 723(a) is analogous to liability under section

**2.** The Trustee has cited cases in which former general partners were sued under Section 723(a), but has not cited any cases in which liability was assessed against a former general partner, nor have the defendants cited any case in which liability was denied because the defendant was not a current general partner. The closest case this court has located is *In re The Ridge II,* 158 B.R. 1016 (Bankr.C.D.Cal.1993), in which the court found that the facts did not support holding limited partners liable as general partners, making it unnecessary to address whether section 723(a) would extend that far. Bramlett cites

to 2 *Collier Bankruptcy Practice Guide* ¶ 20.07, which actually supports the Trustee's position: "Thus, a former general partner that is no longer a general partner in a partnership may not under applicable law be liable for all of the claims that are allowed in the partnership case and, therefore, section 723(a) should be limited in its application to that former partner only to the deficiency in the allowed claims as to which the former general partner is personally liable." The quoted language from *Collier* appears to agree with this court's ruling.

40 of the Uniform Partnership Act); *In re Litchfield Co. of South Carolina Ltd.*, 135 B.R. 797, 803 (W.D.N.C.1992) (state law action to compel contribution from partners is property of the bankruptcy estate). There is no reason to believe that Congress intended a Chapter 7 Trustee to proceed under one statutory provision (section 723) against current general partners, and under another statutory provision (section 541(a) and state partnership law) against former general partners.[3]

A successor partnership is formed every time a partner joins a partnership, leaves a partnership, files for bankruptcy, dies, and so forth. Thus, upon Bucheit's withdrawal and again upon Bramlett's withdrawal, the partnership was dissolved and its business was continued as a successor partnership by the remaining partners. However, the metaphysics of partnership identity should not control the interpretation of section 723(a) in the face of the substantive law of partner liability. To the extent that Bramlett or Bucheit continues to be liable for obligations of the debtor partnership as a result of his position as a general partner of a predecessor partnership, which was engaged in the same enterprise with the same assets and largely the same partners, I do not believe the statute was intended to exclude him on account of the distinction between the debtor partnership and its predecessor.

This interpretation is supported by section 723(b), which provides that the trustee shall first seek recovery of a deficiency under section 723(a) "from any general partner who is not a debtor in a case under this title." Section 723(b) thus acknowledges that a bankrupt general partner has liability under section 723(a). Because state law terminates a partnership when a general partner files for bankruptcy, section 723(b) necessarily implies that a former general partner (e.g., a bankrupt general partner) is a "general part-

ner of the partnership" subject to liability under section 723(a).

Accordingly, the Trustee may sue Bucheit and Bramlett under section 723(a), notwithstanding their prepetition withdrawal from the partnership. Of course, their liability is necessarily limited by the state law rules that define the liability of former general partners.

## IV. LIABILITY FOR THE BUCHEIT & SONS CLAIM

The Trustee seeks judgment on account of the Bucheit & Sons claim against Chandler, Harper, and Bucheit. Martin filed a personal bankruptcy case, in which the Trustee filed a claim pursuant to section 723(c), and so the Trustee does not seek relief against Martin in this adversary proceeding. Bucheit & Sons released its claim against Buchanan and Ricciuti prepetition, and the Trustee therefore does not seek relief against them on account of the Bucheit & Sons claim. Bucheit & Sons has also released its claim against Bramlett, and the Trustee has indicated that he therefore intends to withdraw his action against Bramlett on account of this claim.

### A. Background

In 1986, Bucheit & Sons filed an arbitration action against JTA, in which JTA was represented by Quinn, Ward and Kershaw ("QWK"). During the arbitration proceeding, QWK withdrew from representing the partnership due to nonpayment of its fees. An award of $185,850 was entered in favor of Bucheit & Sons in 1987. Pf.Exh. 56.[4] Some interest accrued on the judgment prepetition, and this court has ruled that it will disallow any portion (as yet undetermined) of the

---

3. To the extent necessary, this court will treat the pleadings as having been amended to assert a cause of action under section 541(a) and state partnership law, in accordance with F.R.Civ.P. 15(b). The court does not believe that this treatment prejudices the defendants in any way because the elements of state law liability are identical to those raised and litigated by the parties under the Trustee's section 723 claim.

4. "Pf.Exh." refers to the Trustee's exhibits filed August 2, 1991. "Pf.Mem.Exh." refers to the Trustee's exhibits attached to the Memorandum of Points and Authorities filed on February 27, 1994.

Bucheit & Sons claim that duplicates amounts owed to Suburban Glass Company.

The arbitration award was challenged by JTA in the Superior Court of the District of Columbia, by a suit brought in the common name of the partnership, Pf.Mem.Exh. 12, although the defendants have made much in this litigation of the inability of a partnership to sue or be sued in its common name in the District of Columbia. JTA never amended its complaint to bring its suit in the names of the individual partners, although the Superior Court provided it with an opportunity to do so. See Pf.Mem.Exh. 15.

In contrast, Bucheit & Sons amended its counterclaim seeking confirmation of the award, naming and serving each then-general partner as a defendant: Buchanan, Chandler, Harper, Martin and Ricciuti.[5] Pf.Mem.Exh. 16; Pf.Exh. 1–5. The D.C. Superior Court confirmed the arbitration award as to each of the partners in the partnership, and therefore as to the partnership itself.[6] Pf.Exh. 57, 58. Chandler filed a motion to vacate these judgments, which was denied by the Superior Court, and now has pending a motion to vacate the order denying the first motion to vacate. Pf.Mem.Exh. 22, 24, 25. Moreover, Chandler and Harper have appealed the judgments (whether on their own behalf or on behalf of the partnership, or both, is unclear). Pf.Mem.Exh. 23, Pf.Exh. 20. The entire proceeding, however, has been stayed as a result of this bankruptcy case. Pf. Mem.Exh. 29, 31.

## B. Challenges of Harper and Chandler to Preclusive Effect of the Superior Court Judgments

■ This court has already found, in its Memorandum Opinion Regarding Claim of Jos. A. Bucheit & Sons Co., Inc. and Objections Thereto,[7] that the Superior Court judgments are valid and are entitled to preclusive effect against the partnership in this bankruptcy case. However, Harper and Chandler contend that these judgments do not have preclusive effect against the individual partners. The direct issue we must address is whether the Superior Court judgments preclude Chandler and Harper from contesting their personal liability on the claim of Bucheit & Sons.

■ The federal full faith and credit statute, 28 U.S.C. § 1738, dictates that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Under D.C. law, "a final judgment on the merits embodies all of party's rights arising out of the transaction involved . . . and precludes relitigation in a subsequent proceeding of all issues arising out of the same cause of action between the same parties or their privies, whether or not the issues were raised in the first trial." *Faulkner v. GEICO*, 618 A.2d 181, 183 (D.C. 1992) (citations and internal quotation marks

---

**5.** Harper and Chandler contend that Bucheit & Sons "did not name all aprtners [sic] of Judiciary Tower Associates, as party defendants, omitting Bernard [sic] Bucheit and Bramlett." Harper and Chandler's Opposition To Trustee's Motion For Summary Judgment, p. 4. Harper and Chandler neglect to mention that Bucheit and Bramlett were no longer partners at the time of that litigation. They cite no precedent for the novel proposition that a partnership is not bound unless all former, as well as all current, partners are sued.

**6.** One judgment reads, in relevant part, "The Court finds that Counterclaim Defendants James Martin, C. Robert Buchanan, Paul J. Ricciuti, and James P. Chandler have been properly served and have failed to answer the Counterclaim against them, that each of the named Counterclaim defendants are general partners of

Judiciary Tower Associates, and with respect to each such Counterclaim Defendant the award in question should be confirmed. It is therefore this 22nd day of February, 1990, HEREBY ORDERED that the award in question in [sic] confirmed, and the Clerk is directed to enter judgment on behalf of Joseph Bucheit & Sons Company against James Martin, C. Robert Buchanan, Paul J. Ricciuti, and James P. Chandler, jointly and severally, in the amount of $185,850, plus interest at the legal rate from March 20, 1987."

The other judgment is essentially identical, except that it states that Robert J. Harper "failed to raise any proper defenses," and directs the entry of a judgment against Harper for $185,850 plus interest from March 11, 1987.

**7.** This order was entered in the main case, No. 90–00297, rather than in this adversary proceeding.

omitted).[8]

■ In seeking contribution under section 723(a), the Trustee stands in the shoes of the creditors. The Trustee's cause of action against the partners is essentially identical to the cause of action belonging to the creditors; the liability asserted by the Trustee is no more, and no less, than the liability that has been or could be asserted by the creditors. During the pendency of this action, this court has enjoined creditors from enforcing their causes of action against the partners, protecting the estate's right to collect on account of these causes of action. As to the Bucheit & Sons claim, the partners' liabilities were established by the judgments entered by the Superior Court, and the partners' rights are in no way prejudiced when this court holds the partners to that judgment by using it to measure the Trustee's right of recovery. ·

The defendants assert that honoring the Superior Court judgments would deprive them of their due process right to contest their individual liability. It may be that due process requires a partner have notice and an opportunity to be heard before he or she can be held liable for a partnership debt. *See Detrio v. United States,* 264 F.2d 658 (5th Cir.1959); *Prado North Residences, Ltd. v. Prado North Condominium Ass'n, Inc.,* 477 So.2d 396 (Ala.1985).[9] And Chandler and Harper put great weight on *Fazzi v. Peters,* 68 Cal.2d 590, 68 Cal.Rptr. 170, 440 P.2d 242 (1968), in which the court held that a judgment rendered in a suit in which the only named defendant was the partnership, but which was served on the individual partners as well, was not enforceable against the individual assets of the partners. But we need not address whether it violates due process for a suit against a partnership in its common name to bind individual partners not named in that suit. Bucheit & Sons named and served all five partners, and those partners had the right and opportunity to contest the liability in the Superior Court proceeding.[10]

8. That the Superior Court judgments were entered by default could, in some jurisdictions, prevent the court from giving those judgments preclusive effect. However, under District of Columbia law a default judgment is entitled to preclusive effect as much as a judgment after full trial on the merits. *Edwards v. Habib,* 227 A.2d 388, 392 (D.C.1967); *David v. Nemerofsky,* 41 A.2d 838 (D.C.1945) ("a judgment by default or confession is equally binding on the party against whom the estoppel is claimed"). Moreover, while it is true that the Superior Court judgment has been appealed and that a motion to vacate the judgment is pending, neither a motion to vacate nor a pending appeal deprives an order of preclusive effect. *Jordan v. Wash. Metro. Area Transit Auth.,* 548 A.2d 792 (D.C.App.1988); *McArdle v. Schneider,* 228 F.Supp. 506 (D.Mass. 1964); *Everson v. Everson,* 494 Pa. 348, 431 A.2d 889 (1981).

Nor does this court believe that the stay of the Superior Court action created by this bankruptcy case creates an equitable or legal factor tending against granting preclusive effect to the Superior Court judgments. Any party who desired to proceed with the Superior Court litigation could have filed a motion to modify the automatic stay in order to do so. No one filed such a motion. Having failed to seek relief to prosecute their appeal, the defendants are in no position to claim prejudice when the Superior Court judgment is given effect.

9. In *Ratchford v. Covington County Stock Co.,* 172 Ala. 461, 55 So. 806 (Ala.1911), a judgment against a partnership, in a state with a common name statute, was found not conclusive evidence of a partnership liability as against an individual partner, the court suggesting that the contrary result would be unconstitutional. Nonetheless, the contrary result obtained in *Benvenuto v. Taubman,* 690 F.Supp. 149 (E.D.N.Y.1988) and *Int'l Shoe Co. v. Hawkinson,* 73 N.D. 677, 18 N.W.2d 761 (N.D.1945) (relying on explicit statutory authority), with no discussion of due process concerns. Similar due process arguments were rejected in *Switzer v. National Housing Partnership,* 641 F.Supp. 150 (D.Conn.1986) and *Dayco Corp. v. Fred T. Roberts & Co.,* 192 Conn. 497, 472 A.2d 780 (Conn.1984). Certainly as to current (rather than former) partners, too much can be made of the due process concerns raised by giving preclusive effect to a judgment against the partnership. *See* Note, Res Judicata and Collateral Estoppel in the Law of Partnership, 65 Cal. L.R. 863, 881–85 (1977).

10. Chandler asserts in his pleadings, but not by way of affidavit or other evidence, that he was not served in the Superior Court suit. However, the judgment entered by the Superior Court specifically finds that Chandler was "properly served." More importantly, Chandler has appeared in that proceeding, and has filed briefs in it. Accordingly, Chandler must be deemed to have waived any argument that he is not bound by that proceeding due to improper service.

Moreover, the undisputed evidence shows that Chandler was the partner primarily responsible for dealing with the partnership's lawyers and its defense in both the arbitration proceeding and the litigation. See e.g., Pf.Mem.Exh. 8; Affidavit of David Tatge, ¶ 2. Even if Chandler were not a

The defendants have shown no facts which cast doubt either on the jurisdiction of the Superior Court to enter the judgments or that they were accorded constitutional due process by that court. Due process certainly does not guarantee a party the right to collaterally attack a judgment rendered in a judicial proceeding by a court of competent jurisdiction in which that party was accorded a full and fair opportunity to litigate its claims and defenses.

Accordingly, this court must grant full faith and credit to the Superior Court judgments, and so holds that the liability of Chandler and Harper has been conclusively established by those judgments.

Chandler and Harper have argued at great length that the Superior Court erred in granting judgments against them. In particular, they argue that the judgments should not have been entered against the individual partners because the partners were not parties to the arbitration proceeding. They argue that an arbitration award against JTA in its common name cannot be enforced against the individual partners. However, to the extent the defendants' arguments may have had any merit, the parties had the opportunity to present them to the Superior Court. Having determined that the Superior Court judgments are entitled to preclusive effect, this court cannot review the merits of those judgments.

The Superior Court entered judgment "jointly and severally" against Chandler, Buchanan, Martin and Ricciuti, and entered a separate judgment against Harper. This court is required to give full faith and credit to those judgments. Thus, the personal liability of Chandler and Harper is conclusively established by Bucheit & Sons's Superior Court judgments. As Chandler and Harper have raised no defenses to their liability under section 723(a) for the deficiency to pay the Bucheit & Sons claim except for their challenge to their personal liability on the claim, summary judgment will be entered against them as to the Bucheit & Sons claim.

party to the litigation, as the partner who controlled the partnership's litigation strategy and who actively participated in the litigation on the partnership's behalf, he would be collaterally es-

### C. *Bucheit's Liability*

The Trustee seeks judgment against Bucheit on account of the Bucheit & Sons claim. As Bucheit has not filed an answer to the complaint nor an opposition to the Trustee's motions for summary judgment, judgment will be entered against Bucheit.

### D. *Amount of Judgment*

■ Prior to obtaining the Superior Court judgment, Bucheit & Sons agreed that it would not pursue against Buchanan and Ricciuti any judgment it obtained. On August 8, 1990, Buchanan and Ricciuti obtained an order from an Ohio state court enjoining Bucheit & Sons from executing its judgment against Buchanan or Ricciuti. The trustee has therefore not sought judgment against Buchanan and Ricciuti on account of the Bucheit & Sons claim, and seeks summary judgment against the other partners only to the extent of 80% of Bucheit & Sons' claim.

D.C.Code § 41–303 provides that when one partner has compromised his or her liability with a creditor, "the discharge of any such partner shall be deemed a payment to the creditor equal to the proportionate interest of the partner discharged in the partnership concern." Buchanan and Ricciuti each originally held a 10% interest in the partnership; at the time of the bankruptcy filing, each held a 12.5% interest. However, in urging that 20% and not 25% is the appropriate reduction, the Trustee notes that he is seeking to impose liability not only on the partners as of the petition date, but also on withdrawn partners Bramlett and Bucheit. Nonetheless, the court finds that, under the statute, the release of Buchanan and Ricciuti must be deemed a payment to Bucheit & Sons of 25% of the claim, "the proportionate interest of the partner[s] discharged in the partnership concern." Nothing in the statute indicates that the fact that former partners may also be liable for some or all of the remaining part of the claim should change the proportion discharged. Moreover, this

topped by determinations against the partnership. *See, e.g., Brunsoman v. Seltz,* 414 N.W.2d 547 (Minn.1987); *Krofcheck v. Ensign Co.,* 169 Cal.Rptr. 516, 112 Cal.App.3d 558 (1980).

ruling is in accord with the Trustee's admission that former general partners stand in a suretyship position with respect to debts of the partnership, and the current general partners are primarily liable for those debts.

\* \* \*

The court therefore finds in favor of the Trustee on the liability, under section 723(a), of Chandler, Harper and Bucheit for seventy-five percent (75%) of the allowed amount of the Bucheit & Sons claim. That amount will be fixed when the court enters an order establishing the allowed amount of the Bucheit & Sons claim and the value, if any, of miscellaneous assets discussed at page 802, above.

## V. *LIABILITY FOR THE SUBURBAN GLASS COMPANY CLAIM*

Suburban Glass was a supplier and subcontractor on the partnership's office building. It obtained a judgment in D.C. Superior Court against the debtor, numerous of its partners, and others, in the amount of $43,-419.50, plus interest and costs. By order dated May 13, 1994, this court allowed Suburban Glass's claim in the amount of $46,-959.30.

The Trustee seeks judgment on account of the Suburban Glass claim against Chandler, Harper, Buchanan, Ricciuti, Bucheit and Bramlett.

### A. *Liability of Chandler, Harper, Buchanan, Ricciuti and Bucheit*

■ Harper and Chandler argue that Suburban Glass's judgment is not binding on the individual partners because they "were not parties to the judgment proceeding [sic] were not served as individuals as such in their individual capacities and are not parties to the judgment." They assert, without support, that they were not parties to the Suburban Glass suit:

> In Suburban Glass' claim of approximately $43,000, J.T.A. was the only named defendant. At the time of its filing, the general partners could have also been named, and if Suburban Glass intended to so name them, it should · have been done at that time. Suburban Glass is now barred by

res judicata from using its Judgment to attempt to hold the individual partners liable, who were never a part of the initial proceedings against J.T.A.

Harper and Chandler's Opposition to Trustee's Motion For Summary Judgment, section 4.

The uncontradicted evidence is otherwise. Suburban Glass did not sue only Judiciary Tower Associates. According to all of the evidence provided by the parties, Suburban Glass filed its complaint against, and served it upon, JTA, Chandler, Harper, Buchanan, Ricciuti, Bucheit, Bucheit & Sons and others. See Pf.Mem.Exh. 2; Affidavit of David Tatge, ¶ 4. An Answer was filed by "Defendants Judiciary Tower Associates, James P. Chandler, Sr., Robert J. Harper, Sr., C. Robert Buchanan and Paul J. Ricciuti, by and through their attorneys." Pf.Exh. 47. A Counterclaim was filed by "Defendants Judiciary Tower Associates, James P. Chandler, Sr., Robert J. Harper, Sr., C. Robert Buchanan, and Paul J. Ricciuti, by and through their attorneys ..." Pf.Exh. 48. A separate answer was filed by Bucheit and Bucheit & Sons. Pf.Exh. 49.

The Superior Court entered a default judgment against all of the "Defendants." It then set an *ex parte* hearing on damages, *see* Super.Ct.Civ.R. 55–II, at the conclusion of which it entered an award against "Judiciary Towers [sic] Associates" in the amount of $43,419.50 plus interest and costs. Pf.Exh. 46. Chandler and Harper appear to contend that the failure to name the other defendants on the order fixing damages excuses them from liability on the Suburban Glass claim. This court disagrees.

■ In the District of Columbia, suit is brought against a partnership by naming and serving all of the partners of that partnership. *See, e.g., Pellegrin & Levine, Chartered v. Antoine,* 961 F.2d 277, 278 (D.C.Cir. 1992); *Lenkin v. Beckman,* 575 A.2d 273, 278 (D.C.App.1990). Suburban Glass did this. It then obtained a default judgment, predicated on the defendants' failure to comply with court orders, against all of the defendants—not just the partnership. Following that default judgment, which established the fact of liability of each of the partners, the

amount of that liability was determined at an *ex parte* hearing, after which an order quantifying the liability was entered against the partnership alone.

▮▮▮▮▮ Under D.C. law, each partner is fully liable for the debts of the partnership. *Lenkin,* 575 A.2d at 276 ("The common law right of creditors to reach the personal property of individual partners in satisfaction of partnership debts is ... adopted in the District of Columbia as D.C.Code § 41–114 (1986)"). The fixing of damages against the partnership, in a proceeding in which all partners are parties and all partners have been found liable, therefore necessarily fixes the liability of the individual partners (except for any individual defense such as discharge in the partner's own bankruptcy case or later payment).

It is true that the order fixing the amount of damages was only entered against Judiciary Tower Associates. However, the partners were all parties to the litigation; they all knew that, as general partners, they are personally liable for the debts of the partnership. They filed answers and counterclaims and otherwise participated in the action. No reasonable conception of due process could hold that partners who are named and served and actively participated in a suit against the partnership are not bound by determinations in that suit adverse to themselves and the partnership.

None of the partners who were defendants in the Suburban Glass suit have raised any individual defense—such as a discharge in the partner's own bankruptcy case—to avoid personal liability for the now unquestionable liability of the partnership itself. Therefore, this court finds that the fact and the amount of the partners' individual liability have been conclusively established by the D.C. Superior Court judgments as to the partners who were defendants in that action, including Chandler, Harper, Buchanan, Ricciuti and Bucheit. As none of these five defendants has raised a valid defense as to any other element of the Trustee's section 723(a) action, summary judgment will be entered against them on account of the Suburban Glass claim with any appropriate adjustment

for the value of assets of the estate in computing the deficiency.

## B. *Liability of Bramlett*

Bramlett was not a party to Suburban Glass's suit in the Superior Court, and so the above analysis does not apply to him. He contests his liability on a number of grounds, including general principles of partnership law and factual allegations relating to the validity of the Suburban Glass claim. Upon review, there is no merit to the legal defenses that Bramlett raises to his liability as a partner in JTA, nor are there any disputed factual issues that preclude judgment against Bramlett on account of the Suburban Glass claim.

### 1. *Partnership Law Defenses*

▮▮▮▮ Bramlett asserts a number of defenses to his liability on the Suburban Glass and QWK claims arising from general partnership law and his withdrawal from the debtor partnership. None of these defenses withstands scrutiny.

First, Bramlett contests his liability on account of the Suburban Glass claim on the ground that the Trustee has not proven what portion of that claim accrued during his tenure as a general partner. Bramlett's argument is that the Trustee has not proven that the Suburban Glass claim actually arose prior to his departure from the partnership, in October 1985, given that Suburban Glass completed performance on its contract in December 1985.

▮▮▮▮ The Trustee asserts that the "bulk" of the Suburban Glass claim arose while Bramlett was a general partner, and that in any event Bramlett is liable for the entire claim pursuant to D.C.Code § 41–135. Under § 41–135(a) the dissolution of the partnership does not in and of itself discharge the existing liability of any partner. Under § 41–135(b), a former partner will be released by agreement, express or implied, of the former partner, the creditor and the partnership. Under § 41–135(c), a former partner will be released by the consent of the creditor to a material alteration in the nature or time of payment of the obligation. Thus,

where a partner withdraws from a partnership under an agreement with his former partners, and the remaining partners continue the business, the departing partner remains liable for partnership obligations incurred prior to his withdrawal unless the creditor modifies the obligation or agrees to release the partner. *See White v. Brown,* 292 F.2d 725 (D.C.Cir.1961).

What the record shows is that Suburban Glass's claim arose from a contract for the provision of material and services on the office building performed between early 1984 and December 13, 1985. O'Malley Affidavit, ¶ 2. Bramlett withdrew from the partnership on October 15, 1985. Bramlett offers no evidence, nor even assertions, of what portion of the Suburban Glass claim arose after his withdrawal, despite more than adequate opportunity for discovery on the issue. *See* Declaration of Reg J. Lormon ("Discovery reviewed by me to date does not indicate precisely when the claims arose of Suburban Glass, Quinn, Ward, and that of Joseph Bucheit and Sons.").

When the partnership entered into its contract with Suburban Glass, it became obligated to fully perform that contract. The obligation, in turn, was a joint liability of all of the partners, including Bramlett. A creditor contracting with a general partnership does so in the rightful expectation that all of the general partners stand behind that contract, and that a partner's withdrawal will not re-lease that partner's responsibility on the contract except as set forth in § 41–135. That Suburban Glass may not have completed its performance until two months after Bramlett left the partnership, when it started work more than 18 months earlier, does not relieve him of liability on the contract. Although it would not change the result were he to do so, Bramlett does not allege that the contract was not substantially performed prior to his departure. Nor does he provide any evidence (and the result would not be changed by such evidence) that the value of the partnership—and of his partnership interest— was not increased by Suburban Glass's performance.

The court rejects the argument that the claim does not lie against Bramlett because the Trustee has not proven what share of the contract was performed in the final two months. In accordance with § 41–135(a), Bramlett is liable for the Suburban Glass claim, regardless of whether performance was finished during his tenure as a general partner, because that claim arises from a contract entered into during his tenure. Indeed, if it were relevant, the evidence suggests that the contract was substantially performed during his tenure.

██ Bramlett also claims that he is not liable on the Suburban Glass and QWK claims [11] because he has reached a settlement or obtained a release from each of those creditors.[12] Under § 41–135(b), a partner is

---

11. The QWK claim is discussed in this section to the extent that Bramlett's defenses to both the Suburban Glass and QWK claims are the same. The remaining issues as to the QWK claim are discussed *infra.*

12. See Defendant Bramlett's Response/Memorandum Of Points And Authorities Objecting To Trustee's Motions Re: Partial Summary Judgment, Reconsideration Of Pre–Trial Order Withdrawing Reference, Seeking Dismissal Of Bramlett's Claims And A Severance Thereof, ET AL., p. 2 ("Bramlett has reached settlements/agreements with regard to the majority of JTA's potential creditors (Bucheit & Sons, Suburban Glass, Chandler, Ricciuti, et al.) such that excepting for Quinn, Ward and Pepco, no other creditor is looking toward Bramlett for satisfaction of any of Debtor JTA's debts ..."); p. 3 ("As to the claims of Ricciuti, et al., and Suburban Glass, Bramlett has settled and/or reached understandings with these creditors so they are no longer seeking any contribution from Bramlett").

The Trustee has offered an affidavit by the attorney for Suburban Glass, who states that "[t]o the best of [his] knowledge, information and belief, neither Suburban Glass Company nor [he] have released any of the partners of Judiciary Towers [sic] Associates ...", and the affidavit of J. Stephen Simms, an associate of QWK, which states in relevant part, "Quinn, Ward and Kershaw, P.A. was not made aware that George Bramlett had withdrawn from the JTA partnership, nor has Quinn, Ward and Kershaw, P.A. ever released George Bramlett ... from any obligations which they owe Quinn, Ward and Kershaw, P.A. through the JTA partnership."

The only arguably contrary evidence in the record is the statement by Chandler that "[QWK] prepared the withdrawal documents from J.T.A. for both Defendants Bramlett and Bucheit in 1985, and knew that Bramlett was releasing his interest in exchange for being released from any partnership liability." Chandler further claims that the fact that QWK did not name Bramlett in

discharged from liability after dissolution of a partnership by an agreement to that effect by the partner, the creditor and the continuing partners. The agreement need not be explicit, but may be inferred from the parties' course of dealing. Even with this liberal standard, Bramlett has no defense under § 41–135(b), because he has pointed to no evidence from which a reasonable fact finder could conclude that the continuing partnership ever agreed to release him from liability, or that Suburban Glass or QWK ever agreed to release him from its claim. Bramlett cannot defeat the Trustee's motion for summary judgment by the mere assertion of a release, without any evidence in support.

■ Next, Bramlett contends that he is not liable under § 723(a) because he understood that he was solely an investor in JTA who was not being exposed to any liabilities—that is, he conceived of himself as a limited partner in JTA. However, having signed the partnership agreement as a general partner, Bramlett cannot escape his liability merely because he viewed himself as a passive investor. *See* 59A Am.Jur.2d *Partnership* § 640 (that a partner considers himself a mere investor is no defense to personal liability for partnership obligations; contrary rule would condone the creation of nonstatutory limited partnerships).

Bramlett also asserts that the debtor is a successor partnership to the partnership he belonged to, and that he therefore has no liability for its debts. To the extent that this argument is meant to rebut the requirement that he be a "general partner of the partnership" under section 723(a), it has been rejected in section III above. To the extent this argument is meant to rebut Bramlett's per-

sonal liability on the Suburban Glass claim, it fails because of the requirements of § 41–135, discussed in the preceding paragraphs.

As his next argument, Bramlett asserts that partnership law in the District of Columbia imposes only joint, and not joint and several, liability on the partners in the partnership. Accordingly, he argues, each partner is liable only for the percentage of each claim equal to that partner's percentage interest in the partnership. Because Bramlett had no partnership interest when Suburban Glass brought its enforcement action, Bramlett argues, he has no liability, or at most, his liability must be limited to his 1.25% partnership interest.

■ This argument, too, must fail. First, that D.C. law may impose only joint liability does not mean that each partner is not liable for the full amount of each debt.[13] Rather, it means that each partner has the right to insist that every other partner be joined in a judicial proceeding to enforce that debt. *See* Bromberg, *Enforcement of Partnership Obligations—Who is Sued For The Partnership*, 71 Neb.L.Rev. 143, 146–47 (1992) ("In joint liability, all the joint parties (partners) must be sued … In joint and several liability, all the parties may be sued together, or, … any one or more may be sued separately or together."). However, any general partner can be held liable for the full amount of each debt owed by the partnership. *Id.* at 160 (under joint liability, "each partner is considered liable for the full amount of the contract, although the plaintiff is entitled to only one satisfaction."); *CS Associates*, 160 B.R. at 909; 59A Am.Jur.2d *Partnership* § 639. Second, the Suburban Glass claim did not accrue when the action

the suit "serves as an acknowledgement by [QWK] that Defendant Bramlett was not a recognized partner who they had a Judgment against."

Accepting all of Chandler's statements, they do not show a release by QWK of Bramlett. The assignment by which Bramlett sold his partnership interest, which Chandler asserts QWK drafted, did not purport to release Bramlett from the partnership's liabilities in general, only from liability on "promissory notes," of which the Chandler notes are the only examples referred to in the record. Pf.Exh. 63 ("Bramlett is hereby relieved of personal liability under promissory notes on which he is either maker or guarantor to the partnership.") Moreover, the agreement

was solely between Chandler and Bramlett, and Chandler lacked the authority to release any other creditor's claim against Bramlett. Nor has Chandler or Bramlett identified any case purporting to hold that the failure to name a former partner in a suit against a partnership acts as a release of that former partner.

13. We need not address whether partners are jointly and severally liable under D.C. law pursuant to D.C.Code § 16–2101. See the article cited later in this paragraph, 71 Neb.L.Rev. at 163 n. 106.

was brought, but when the underlying contractual obligation came into being. Bramlett was therefore a partner when the obligation arose.

### 2. *Defenses On The Underlying Claim*

 Despite the failure of all of Bramlett's legal arguments, summary judgment against Bramlett is not warranted if there exist genuine factual issues pertaining to the amount and validity of Suburban Glass's claim against the partnership. Bramlett argues that there are counterclaims against Suburban Glass for failure to properly perform its work which provide a defense he is entitled to raise against his personal liability on the debt.[14]

The Trustee would overcome this objection by having this court hold that the Superior Court judgment established the validity and amount of the partnership's debt to Suburban Glass, and that this determination is binding on Bramlett. Bramlett responds that he withdrew from the partnership prior to the commencement of the Suburban Glass lawsuit, and he was neither named as a party nor served with process in that suit. Accordingly, he argues, he has not had an opportunity to contest his personal liability for that claim and due process requires that he have such an opportunity.

If Bramlett had participated in the Superior Court litigation, even though not named as a defendant, there would be a credible argument that he is collaterally estopped from challenging the issues resolved by the resulting judgment. *See, e.g., Bertoli v. D'Avella (In re Bertoli)*, 812 F.2d 136 (3d Cir.1987); *Brunsoman v. Seltz*, 414 N.W.2d 547 (Minn. 1987); *Krofcheck v. Ensign Co.*, 169 Cal. Rptr. 516, 112 Cal.App.3d 558 (1980).[15] If . Bramlett had not participated in the litigation but had been a general partner, case law suggests that he could not be collaterally estopped, at least not beyond his interest in the partnership property. *See Resolution Trust Corp. v. Teem Partnership*, 770 F.Supp. 1439 (D.Colo.1991) (general partner not estopped by judgment against partnership and other partners); *Arkoma Coal Corp. v. Alexander*, 593 F.Supp. 1524 (W.D.Ark.1984) (investors not estopped by judgment rendered against their joint venturer); *Harrison Nat'l Bank v. Lion Varnish Work, Inc.*, 97 N.Y.S.2d 71 (N.Y.City.Ct. 1950); *compare Whitley v. Klauber*, 51 N.Y.2d 555, 435 N.Y.S.2d 568, 416 N.E.2d 569 (1980) (limited partners collaterally estopped by judgment against limited partnership as to liability for partnership property, needed to satisfy existing creditor, that had been paid to limited partners).

In fact, not only did Bramlett not participate in the litigation, he was not even a

**14.** The court rejects Bramlett's other affirmative defenses. Bramlett has made vague assertions of waiver and estoppel, but he has failed to enunciate any basis for these defenses or adduce any evidence in support of them, and the court accordingly rejects them. He also has asserted a defense based on an unspecified statute of limitations. Because he has neither suggested what statute of limitations is applicable nor set forth facts or a legal theory in support, the court overrules this defense as well. Bramlett makes similar or identical arguments with respect to the QWK claim, which are rejected for the same reasons.

**15.** An analogous situation that has been more frequently litigated is the ability of a creditor, having obtained a judgment against a debtor, to preclude a guarantor from contesting the validity and amount of the debtor's obligation. The general rule is that the guarantor, not being a party to the prior litigation, cannot be prevented from reintroducing any and all defenses that may have existed to the debtor's liability unless the guarantor had full knowledge of the prior litigation and

an opportunity to defend in that suit. *Mayfield v. Hicks*, 575 S.W.2d 571, 574 (Tex.Civ.App.1978) ("the opportunity to defend must be such that the guarantor can actually control the suit with respect to any defenses including those available to the primary obligor"). Guarantors have been subject to collateral estoppel where they participated, but were not named as parties, in the first proceeding. *See e.g., Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918 (9th Cir.1988) (applying law of Washington state, guarantor who was witness in prior proceeding is estopped by judgment); *E.B.R. Corp. v. PSL Air Lease Corp.*, 313 A.2d 893 (Del.1973) (participation by surety results in preclusion, even if surety withdrew prior to judgment); *S.H. Kress and Co. v. LPN 1st Ave. Corp.*, 37 Misc.2d 570, 235 N.Y.S.2d 339 (N.Y.Sup.Ct.1962) (lease guarantor, who participated in prior litigation as president of lessee corporation, precluded from relitigating matters established by judgment against lessee corporation).

general partner at the time of the litigation. The interests of a former partner (who has no interest in the partnership profits going forward nor liability for debts incurred in the future) may differ from those of the current partners who control the litigation. On these facts, the prior litigation cannot be used to deny Bramlett the opportunity to contest his personal liability for the Suburban Glass claim.

■ Nonetheless, Suburban Glass has filed an affidavit stating that it provided materials and services to the debtor between early 1984 and December 1985 for which it has not been paid, and it has filed a proof of claim for this debt. Given Bramlett's undisputed role as a former general partner in the debtor, this is enough to make out a *prima facie* case that Bramlett is liable. Accordingly, Bramlett must provide some evidence from which a reasonable fact finder, drawing all reasonable inferences in favor of Bramlett, could conclude that there is merit to one or more of his defenses. There are absolutely no materials in the record from which this court can find any factual basis for any of Bramlett's purported defenses against the Suburban Glass debt. Summary judgment will therefore be entered against Bramlett on account of the deficiency in estate assets to pay the Suburban Glass claim.

*　　*　　*

Judgment under section 723(a) will therefore be entered in favor of the Trustee and against each of Chandler, Harper, Buchanan, Ricciuti, Bramlett and Bucheit in the amount of $46,959.30 on account of the deficiency in estate assets to pay the Suburban Glass claim, less any adjustment for unvalued assets of the estate.

## VI. *THE QUINN, WARD & KERSHAW CLAIM*

On account of the QWK claim, the Trustee seeks judgment against Chandler, Harper, Bucheit and Bramlett.[16] The Trustee does not seek relief against Buchanan and Ricciuti, each of whom settled his personal liability with QWK prepetition.

### A. *Factual Background*

In 1986, Bucheit & Sons filed its arbitration proceeding against JTA, which retained QWK to represent it in the arbitration. When the debtor fell behind in payment of its fees, QWK withdrew from representing the debtor. The debtor did not obtain substitute counsel, and the arbitration resulted in an award of $185,850 against the debtor.

In 1987, QWK brought suit against the debtor and various of its partners (including Chandler, Harper, Buchanan and Ricciuti) in Maryland state court seeking its unpaid fees. The record contains undisputed evidence of the service of this complaint on Chandler, Harper, Martin, Bramlett, Buchanan and Ricciuti.[17] Pf.Exh. 51–54; Affidavit of David

---

16. Certain of Bramlett's defenses to his personal liability on account of the QWK claim are addressed in Section V.B., *supra.*

17. Chandler and Harper state that "In the case of [QWK's] claim, only the partnership was sued ...." Opposition, § VI. This appears to be yet another misstatement of the facts, although the parties could have been clearer in establishing the record. No copy of QWK's complaint has been put in the record. In their Pre–Trial Statement, Buchanan and Ricciuti state that QWK "brought suit against the partnership and various partners," but do not identify which partners. Similarly, some pleadings from the QWK lawsuit, offered as exhibits, show a caption of "QUINN, WARD AND KERSHAW, PA., Plaintiff, v. JUDICIARY TOWER ASSOCIATES, *et al.*, Defendants," the "*et al.*, Defendants," indicating that at least some unidentified partners were individually named as defendants. See Pf.Exh. 51 (order directing service on Chandler); Pf.Exh. 54 (Affidavit of Service).

A close examination of the evidence identifies at least some of the partners who were named in the suit. Pf.Exh. 54, one of QWK's affidavits of service, refers to "defendant George E. Bramlett," "defendant C. Robert Buchanan," and "defendant Paul J. Ricciuti," and contains a copy of a postal receipt signed by Bramlett and of postal receipts signed on behalf of Buchanan and Ricciuti. The record also contains an order directing service on Chandler. Pf.Exh. 51. Moreover, Chandler states in his Declaration that QWK "had obtained a Default Judgment against each of the named Defendants, (Chandler, Harper, Buchanan and Ricciuti) ...". This is supported by the Memorandum of Law In Support Of Motion To Withdraw Appearance which was filed by QWK in the Suburban Glass litigation, and which Chandler has attached to his Declaration, which states in relevant part that QWK has "filed ... an action to recover $59,297.63 in attorney's fees which are owed by Judiciary Tower Associates and the partners of that partnership, name-

Tatge, ¶ 6. Bucheit was not served with this complaint. A default judgment was then entered against the debtor, Chandler, Harper, Buchanan and Ricciuti, see Chandler Declaration, ¶ 7 and Exh. "G", although the judgment itself is not in the record. No judgment was entered against Buchanan and Ricciuti, who settled with QWK by payment of their share of the fees. There is no indication that the judgment was entered against Bramlett.

Apparently, Chandler then filed a motion to vacate the default judgment. As a result, debtor and QWK entered into a settlement agreement pursuant to which the motion to vacate was to be withdrawn and a consent judgment was executed in favor of QWK and against "Defendant Judiciary Tower Associates". The agreement apparently provided that QWK would not file the consent judgment as long as the debtor was engaged in certain negotiations with a reasonable prospect to lease or sell the building. Chandler signed the consent judgment for the debtor.

When progress allegedly lagged in disposing of the building, QWK filed the consent judgment, and on December 2, 1987, the judgment was entered by the Circuit Court for Howard County, in the amount of $44,473.23, plus interest at the Riggs Bank prime rate from July 31, 1987. Pf.Exh. 50. The debtor then filed a motion to vacate the consent judgment and to file an answer, as well as a four count counterclaim. The state court denied the debtor's motion to vacate the consent judgment. The debtor did not appeal from entry of the judgment.

On July 18, 1988, QWK sued the debtor in the District of Columbia Superior Court, seeking to enforce the Maryland judgment. The debtor moved to dismiss on the grounds that under D.C. law, the partnership was not susceptible to suit in its own name. The Superior Court denied this motion, ruling that it was required to accord full faith and credit to the Maryland judgment. The debtor appealed, and lost. The debtor then filed an answer and counterclaims for legal malpractice.

The debtor filed this Chapter 7 case in April of 1990. The Chapter 7 trustee, David Tatge, then entered into a settlement agreement with QWK, pursuant to which QWK reduced its claim to a total of $39,052.37, and the debtor dismissed its counterclaims with prejudice. Chandler filed an opposition to this settlement. By order dated December 28, 1990, this court approved the settlement agreement, with the condition that the Stipulation of Consent Judgment to be entered in the Superior Court "be without prejudice, nor does it determine, whether the said judgment is recourse or nonrecourse, which issue is reserved."

Having approved the settlement, and over the objections of Chandler, Harper and Bramlett, this court allowed the QWK claim in the amount of the settlement, $39,052.37.[18]

### B. Effect Of The Maryland Judgment on Chandler, Harper and Bramlett

■ Once again, the question is whether a state court judgment is to be given preclusive effect against the general partners of the debtor (Chandler, Harper and Bramlett). The facts here differ somewhat from the previous cases, however. First, QWK's judg-

---

ly, James P. Chandler, Sr., Robert J. Harper, Sr., C. Robert Buchanan, and Paul J. Ricciuti ..." Based on the defendants' admissions quoted in the previous statements and on the affidavits of service and order of service—and notwithstanding the unsupported statement in Chandler's and Harper's Opposition—the uncontroverted evidence shows that Chandler, Harper, Bramlett, Buchanan and Ricciuti were named and served as defendants in QWK's complaint.

18. As a general rule, this court believes that the allowance of a claim in a partnership bankruptcy case will preclude the partners, who are parties in interest in that case, from subsequently asserting that the partnership debt is otherwise than as set forth in the allowed claim. However, this court specifically ruled in allowing the QWK claim that the availability of the malpractice counterclaims should be litigated by the partners in this adversary proceeding, and will not preclude that litigation on account of the order allowing the QWK claim.

However, this does not mean that QWK must be joined as a party in this adversary proceeding. The counterclaims are not being raised as a defense to the debt owed to QWK. Rather, they are being raised as a defense to the Trustee's action for contribution, as a way of denying the satisfaction of one element of a section 723(a) claim (that the partner be liable on the claim).

ment was obtained in Maryland, and its preclusive effect is therefore governed by Maryland law. Second, the judgment was a consent judgment entered against the partnership, not against the partners individually. Accordingly, the consent judgment alone cannot establish any partner's liability, it can only establish an element of that liability— that the partnership owed the debt.[19] If that is established, the Trustee still must show that each defendant is personally liable under District of Columbia partnership law for the partnership's obligation to QWK.

■ The defendants contend the QWK judgment is not valid because the partnership is not susceptible to suit in its common name. As noted above, this is true in the District of Columbia. However, this court must give full faith and credit to the Maryland judgment in accordance with Maryland law, even though the same judgment might not have been available under D.C. law. *See Operative Plasterers' v. Case,* 93 F.2d 56 (D.D.C.1937). Unlike the District of Columbia, Maryland has a statute permitting a partnership to be sued in its common name. Md.Code Ann., *Courts & Judicial Proceedings* § 6–406. Thus, the Maryland suit was properly brought against the partnership, and the judgment is not invalid for that reason.

■ The next issue is whether the judgment is entitled to preclusive effect, under Maryland law, in this proceeding. Maryland applies a four-part test to determine whether it is appropriate to permit non-mutual collateral estoppel:

(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?

(2) Was there a final judgment on the merits?

(3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

(4) Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Leeds Fed. Sav. & Loan Assoc. v. Metcalf,* 332 Md. 107, 630 A.2d 245 (1993), *citing, Washington Suburban Sanitary Commission v. TKU Associates,* 281 Md. 1, 376 A.2d 505 (1977).

The first element—that the issues be identical—is satisfied, because the validity and amount of the partnership's liability to QWK is the issue presented in both this proceeding and in the Maryland case.

■ As to the second element—whether the Maryland judgment is a final judgment on the merits—a question is raised by the fact that the Maryland litigation concluded in the entry of a consent judgment, rather than a litigated judgment. Until recently, the law in Maryland was clear that consent judgments were accorded the same preclusive effect as litigated judgments. *See, e.g., MPC, Inc. v. Kenny,* 279 Md. 29, 367 A.2d 486, 490 (1977); *Frontier Van Lines v. Md. Bank & Trust Co.,* 274 Md. 621, 336 A.2d 778 (1975); *Travelers Ins. Co. v. Godsey,* 260 Md. 669, 273 A.2d 431, 435 (1971). However, in *Welsh v. Gerber Products, Inc.,* 315 Md. 510, 555 A.2d 486 (1989), the Maryland Court of Appeals held that a consent judgment entered in a suit between a plaintiff and one tortfeasor was not binding on the plaintiff, as to the amount of damages suffered, in a subsequent suit between the plaintiff and another alleged tortfeasor.

In *Welsh,* the plaintiff agreed to settle the first suit for the amount of the defendant's insurance, explicitly reserving his right to proceed against any additional tortfeasors. To effectuate the settlement, the plaintiff and defendant entered into a consent judgment in the amount of the insurance, which was then marked "Paid and Satisfied." In a subsequent suit against another defendant, the new defendant argued that the prior judgment fixed the plaintiff's damages and, having received full satisfaction of those dam-

---

**19.** *Pellegrin & Levine, Chartered v. Antoine,* 961 F.2d 277 (D.C.Cir.1992), is distinguishable. In that case, the Court of Appeals upheld an order vacating a consent judgment that had been entered against a partnership, where only one of the two partners had been served. The partners here have been both named and served in the suit which resulted in the judgment against the partnership.

ages, he could not maintain a suit against the new defendant.

The court held that a consent judgment structured to effectuate an insurance settlement does not, in the face of an explicit reservation of rights, constitute a judicial determination of damages entitled to preclusive effect. "A defendant who insists upon the protection of a consent judgment ... may settle his case and, *provided the parties are careful to properly document their true intentions* ... the plaintiff may still pursue a full recovery by proceeding against others who may be responsible for his injury." 555 A.2d at 493 (emphasis added). The controlling question is whether the parties intended the consent judgment to be entitled to preclusive effect; in *Welsh,* the "express and articulated intent of the parties to the settlement was that the judgment would *not* have nonmutual collateral preclusive effect on the issue of damages." *Id.* (emphasis in original). Accordingly, the consent judgment could not be used as collateral estoppel against the plaintiff in that case.

Because the Trustee bears the burden of proof on his cause of action under section 723, he must show the applicability of collateral estoppel. However, having established that the consent judgment was entered in the Maryland litigation, a presumption must attach of the validity and enforceability of that judgment against the parties to that litigation. *See, e.g., Johnson v. Zerbst,* 304 U.S. 458, 468–69, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461 (1938) (when collaterally attacked, absent proof of constitutional infirmity, judgment is presumed valid); *Lowman v. Falsetti,* 335 F.2d 632 (5th Cir.1964) (when "a judgment is collaterally attacked, every reasonable presumption that may be necessary to uphold it will be indulged, the necessary jurisdictional facts will be presumed, and it will be presumed also that in rendering the judgment, the court complied with all the

mandatory provisions regulating its exercise of power").

The defendants bear the burden of producing some evidence tending to overcome the presumption of validity attaching to the Maryland judgment. However, none of the defendants has even asserted (let alone offered an affidavit or other evidence) that the consent judgment was not intended at the time to be a final determination of the amount and validity of the partnership's obligation to QWK, or that the parties intended at the time that the consent judgment not bind individual partners.[20] In fact, the reverse is more natural and likely: that the judgment against the partnership, agreed to by the partners in litigation to which they were parties, was intended to fix their liability, the same (but perhaps with greater finality) as would a note given by the partnership. There is nothing in the record to suggest that QWK waived its rights against the partners in exchange for a consent judgment enforceable solely against the assets of the insolvent partnership, nor anything to suggest a reason why QWK, knowing as it did that the partnership was in dire financial straits, would have done so.

As the defendants have provided no evidence to rebut the validity of the Maryland judgment and have failed to raise an issue of fact regarding any intent that that judgment not have preclusive effect, the judgment is a final judgment on the merits that may be entitled to preclusive effect under Maryland law notwithstanding that it was entered by consent.

The third prong of the collateral estoppel test is whether the party against whom estoppel is asserted was a party or privy of a party to the earlier litigation. Chandler and Harper were general partners in the debtor and were named and served in the litigation. As to Bramlett, he was a former partner at the time of the litigation,

---

20. Although the record does not clearly show it, the vacated judgment may have been against both the partnership and individual partners, while the consent judgment—which was drafted by QWK under the terms of the settlement agreement—was against the partnership alone. Even if this is the case, however, this would not satisfy the requirement of *Welsh* because there is no

expressly articulated intent that the judgment not have preclusive effect against the individual partners. The parties could well have intended the judgment to have preclusive effect as long as the partners' day of reckoning was delayed—that is, as long as no judgment against them individually was to be entered immediately despite entry of a judgment against the partnership itself.

but he too was named as a defendant and served with the complaint. Each defendant's personal interests were fully aligned with the interests of the partnership, because their liability was and is coextensive with the liability of the partnership. I therefore find that Chandler, Harper and Bramlett were privies to the partnership and parties to the litigation, and the third prong of the test is satisfied as to them.

The final issue is whether the parties have had a full and fair opportunity to litigate the issue. The record clearly establishes that Chandler, Harper and Bramlett did. Each was named in and served with the complaint filed by QWK. Each was (or should have been) aware that as a matter of partnership law, he was liable for the debts of the partnership. Each could have participated in the litigation if he chose to contest the partnership's liability. Instead, they chose to have the partnership enter into a settlement agreement with QWK, fixing that liability but delaying its entry.[21] Nothing in these facts shows any impediment that deprived a partner of the opportunity to fully and fairly litigate claims by or against QWK.

Chandler asserts that he did not have a proper opportunity to contest the entry of the Maryland judgment: "Contrary to [the settlement] agreement, [QWK] caused a Judgment to be entered as against [JTA], in its common name, while [JTA] was attempting to dispose of the building. The Howard County judge would not allow Chandler to appear pro se and defend against the Consent Judgment on the ground that [QWK] never intended to honor their agreement." Declaration of James P. Chandler in Support of Defendant Bramlett's Response To Plaintiff's Motion For Partial Summary Judgment dated July 3, 1991, ¶ 6b.

■ Chandler does not dispute that JTA and QWK entered into an agreement provid-

ing for entry of a consent judgment under certain circumstances. Having participated in and agreed to the formation of that agreement—it was Chandler's motion to vacate that gave rise to the agreement, and Chandler executed the agreement on behalf of the partnership—Chandler was aware that it called for entry of a judgment against the partnership (with no judgment against him individually) in those circumstances. The defendant with standing to contest the entry of judgment pursuant to the agreement was the partnership, and the partnership was free to raise any appropriate defenses. However, Chandler was a general partner of the partnership and was in control of the partnership's litigation. Accordingly, he is bound by the issues that were necessarily decided as part of the consent judgment against the partnership. *Bertoli*, 812 F.2d at 140; *Brunsoman*, 414 N.W.2d at 550; *Krofcheck*, 169 Cal.Rptr. at 522, 112 Cal.App.3d at 568.

Moreover, if there was any merit to Chandler's contention that the consent judgment was improperly entered, the partnership that Chandler controlled could have pressed the point and pursued it by direct appeal. No appeal was taken.

As in the analogous case of a guarantor who could actually control the suit with respect to defenses available to the primary obligor, see cases discussed in footnote 15, *supra*, Chandler had a fair opportunity to defend the action, both as a party thereto and as general partner of the partnership, and is thus bound by the judgment.

Finally, even if a judgment had not been entered pursuant to the agreement prior to the filing of JTA's bankruptcy case, the agreement would be enforceable in this court. Chandler has not offered any evidence of a valid defense to enforcement of the agreement in this court, on the facts as

---

21. It is true that Bramlett was not a current partner at the time of the litigation, and so arguably had no control over the partnership's decision to enter into the settlement agreement. However, he was a party to the litigation, and he apparently raised no objection to settlement agreement or to the consent judgment. Moreover, the current partners were his agents in resolving claims against the partnership for

which he may be liable, with the proviso that certain actions they might have taken would have relieved Bramlett of liability under D.C.Code § 41–135(b) or (c). These sections are not implicated because QWK has not agreed to release Bramlett nor agreed to a material alteration of the obligation; rather, it acted to enforce its rights against the partnership and partners.

they have since developed.[22] Judgment allowing QWK's claim would be appropriate on the basis of the agreement. Chandler participated in the litigation that gave rise to the agreement and has had a fair opportunity in this court to show that the agreement is not enforceable. The pleadings and evidence fail to show any valid defense to the present enforcement of the agreement. Even if the alleged intention of QWK never to comply with the agreement could be a valid defense, Chandler's affidavit does not state any facts in support of that defense of fraud. Accordingly, the court would be forced to allow a claim in the amount that the agreement required to be entered as a judgment. Because that amount exceeds the amount to which the trustee and QWK have agreed (and the court has approved) as the allowed claim in this case, however, the defendant's potential liability pursuant to section 723 on account of this claim is limited to the allowed amount of the claim, not the amount set forth in the agreement.

All four prongs of Maryland's test for collateral estoppel are satisfied as to Chandler, Harper and Bramlett. Accordingly, this court finds that the Maryland judgment established the validity and amount of the liability of the debtor to QWK, and Chandler, Harper and Bramlett cannot reopen that determination.

■ Chandler, Harper and Bramlett have repeatedly asserted their desire to raise claims of malpractice against QWK as a defense to their liability on the QWK claim.[23] These malpractice claims were previously filed as counterclaims in the Maryland state court action, as well as in the D.C. Superior Court action. These defendants had both the ability and the motive to press the malpractice claims in the Maryland litigation if they saw fit to do so. They chose, instead, to compromise those claims through a settle-

ment agreement and consent judgment. They cannot now avoid the bargain which they made by relitigating these claims. Having asserted the counterclaims in a prior action which resulted in a judgment in favor of QWK, the parties to that proceeding are precluded from relitigating those counterclaims. *Felger v. Nichols,* 370 A.2d 141, 35 Md.App. 182 (1977) ("a court's determination that a lawyer is entitled to a legal fee, made after a client has, as a matter of defense, produced evidence to show inadequate legal representation, would be a bar in a malpractice suit alleging inadequate legal representation"); *Texas Gulf Citrus And Cattle Co. v. Kelley,* 591 F.2d 439 (8th Cir.1979) (where legal malpractice claim was compulsory counterclaim under state law to attorney's state court action for legal fees, state court judgment was res judicata as to legal malpractice claim); *see also* Harper and Chandler's Opposition To Trustee's Motion For Summary Judgment, p. 7 ("res judicata will preclude a party's relitigation of a claim or defense, regardless of whether or not it was previously raised, if the party had been allowed a reasonable opportunity to do so").

### C. *Individual Defenses To Liability*

■ Because judgment has been entered only against JTA, and not against the individual partners, these partners must be permitted to argue any facts or defenses which raise a question as to whether they are each liable for the partnership's obligation to pay the QWK claim. *Compare Benvenuto v. Taubman,* 690 F.Supp. 149 (E.D.N.Y.1988) (Partner A and partnership were found liable in first tort suit; Partner B's liability is "conclusively established" unless he can show that tort was not committed in the course of partnership business or that he was not a partner); *Gilbert Switzer & Assoc. v. Nat'l Housing Partnership, Ltd.,* 641 F.Supp. 150 (D.Conn.1986); *Dayco Corp. v. Fred T. Rob-*

---

**22.** Even if the partnership were still marketing the property at the time the consent judgment was entered, it has since abandoned the property to the mortgagee. Accordingly, the consent judgment could now be entered in accordance with the agreement. No defendant has alleged any facts evidencing any prejudice out of premature entry of the consent judgment by the Maryland court, if it was in fact premature.

**23.** These assertions have been made in the main case, rather than in this adversary proceeding, but in the interests of justice and completeness, the court will take notice of this objection as if properly raised in this proceeding.

*erts and Co.,* 192 Conn. 497, 472 A.2d 780 (1984). Accordingly, any individual defenses that these partners may have as to their personal liability, given that the partnership liability is established, must be determined in this proceeding and are not controlled by the prior judgment.

Reviewing the record, neither Chandler nor Harper has raised a colorable factual or legal defense to his liability as a partner, given that the partnership's liability has been conclusively established. Finding no valid defenses, summary judgment will be granted to the Trustee and against Chandler and Harper on account of the QWK claim.

 As to Bramlett, the court cannot say that the record is so devoid of evidence of potential defenses to liability for the QWK claim that summary judgment may be entered against Bramlett on account of that claim. Trial will be set on the question of whether Bramlett is personally liable on account of the QWK claim so as to be liable to the estate under section 723(a).

### D. *Liability of Bucheit*

Although Bucheit was not a defendant in the state court litigation, he has been served with the Trustee's complaint and has not filed an answer nor opposed the Trustee's motion for summary judgment. Accordingly, judgment will be entered against Bucheit on account of the QWK claim.

### E. *Amount of Judgment*

QWK released Buchanan and Ricciuti in exchange for a payment, so the Trustee states that he is only seeking 80% of the settled claim of $39,052, or $31,240. As noted above, under D.C. law, the release of Buchanan and Ricciuti resulted in a 25% diminution of the claim. Judgment will thus be entered against the remaining partners for $29,289.

## VII. *THE CHANDLER CLAIM*

### A. *Allowance of the Chandler Claim*

Chandler has filed a proof of claim for $1,517,218.36, representing unpaid principal and interest on the notes he received as partial consideration for the land he sold to the partnership. On May 13, 1994, this Court entered and order to show cause why the Chandler claim should not be allowed. No responses were filed, and the claim has been allowed.

### B. *Judgment on the Chandler Claim*

 The Trustee seeks judgment under Section 723(a) against Chandler, Harper, Buchanan, Ricciuti and Bucheit on account of the Chandler claim.[24] Buchanan, Ricciuti and Bucheit do not deny that the partnership executed the notes to Chandler in exchange for title to the land, nor that they were partners at the time. Buchanan and Ricciuti, through counsel, have stated in pleadings that they might have factual defenses against their liability on the Chandler claim arising from purported misrepresentations made by Chandler. However, they have provided no affidavits nor any other factual support for these assertions. On the record before the court, summary judgment in favor of the Trustee must be granted against Chandler, Harper, Buchanan, Ricciuti and Bucheit on account of the Chandler claim.

### C. *Chandler's Right To Set Off*

 Chandler asserts that he must be allowed to offset against any section 723 liability the partnership's liability to him on the land purchase notes. Section 553(a) of the Bankruptcy Code provides for the setoff of mutual claims "that arose before the commencement of the case under this title."

Clearly the partnership's obligations to Chandler arose before commencement of this case. However, this is not so clear on the Trustee's claim. Although there does not appear to be any precedent directly on point, the Trustee's action under section 723(a) arguably is created by the Bankruptcy Code when the case is filed. The contrary argument is that the substantive liability that underlies a section 723 action accrued against the partners when the creditors' claims ac-

---

**24.** The Trustee has indicated an intent to withdraw its count against Bramlett on account of the Chandler claim, in recognition of Chandler's apparent release of Bramlett when Bramlett withdrew from the partnership. *See* Trustee's Response, DE # 106, pp. 25–28.

crued. *See In re Marketing Resources Int'l Corp.*, 35 B.R. 353 (Bankr.E.D.Pa.1984) (preference action under section 547(b) arose prepetition). As discussed above, section 723 essentially codifies the existing state law right of the partnership to obtain contribution from the partners for its deficiency, creating a procedural mechanism for collecting this liability in the bankruptcy case. It would advance form over substance to claim that this cause of action only arose upon the filing of the petition.

By the same reasoning, however, if this contribution action is thought of as actions by the partnership creditors against the partners, then there is no mutuality of claims. That is, Chandler would have no right to set off his liability to, say, Bucheit & Sons, against the note owed to him by the partnership. That difficulty, however, does not apply where Chandler seeks to set off (a) his claim against the partnership, with (b) the part of his § 723 liability arising from that very claim against the partnership. Regardless of whether § 553(a) applies, a right of setoff ought to exist here even if the § 723 claim is a post-petition claim.

■■■ In the end, the question of setoff is an equitable determination for this court to make. *In re Southern Industrial Banking Corp.*, 809 F.2d 329, 332 (6th Cir.1987); *United States v. Norton*, 717 F.2d 767, 772 (3d Cir.1983). Whatever policies might exist against allowing setoff do not apply here.

This is not the typical case, because Chandler's—and each other partner's—liability to the partnership is basically coextensive with the partnership's deficiency.[25] After setting off Chandler's claim and the judgment against him, Chandler will receive no distribution on his claim, and will presumably have contribution claims against his partners for their proportionate shares of the liability he has "paid" himself through the offset. However, the policy of § 723 in making non-partner creditors whole will not be frustrated by allowing an offset, because Chandler will still be liable for the deficiency in estate assets to pay the claims of other creditors for which he is personally liable. Offset, in this case, does not appear to prejudice the estate or its unsecured creditors in any fashion.[26] The court will therefore enter an order setting off the partnership's liability to Chandler on the notes, against Chandler's liability under section 723.

Bramlett has asserted that the Chandler claim should be equitably subordinated to the claims of other creditors, asserting that Chandler misrepresented the value of the land when he sold it to the partnership. Given the decision on Chandler's right to setoff, this issue need not be decided.

## VIII. *MISCELLANEOUS CLAIMS*

The Trustee has also asserted claims under Section 723(a) on account of the allowed claims of (1) M & B Ceramic Tile ($915.25; asserted against Chandler, Harper, Bramlett, Bucheit, Buchanan and Ricciuti); (2) Buchanan, Ricciuti & Balog, Architects ($20,000; asserted against Chandler, Harper, Bucheit, Buchanan and Ricciuti); and (3) Pepco ($4,974.66; asserted against Chandler, Harper, Bramlett, Bucheit, Buchanan and Ricciuti).

As to the M & B Ceramic Tile claim, the proof of claim shows April, 1986 as the date that claim was incurred. This was roughly

---

**25.** That Chandler is personally liable on the partnership's debt to Chandler follows from D.C.Code Section 41–117(2), which provides that each partner "must contribute toward the losses, whether capital or otherwise, sustained by the partnership according to his share of the profits." If Chandler, a 61.25% partner, were not liable on the debt the partnership owes to him, then his copartners would bear 100% of the loss on his claim and the share of the losses would not be according to the percentage interest in the profits. Moreover, D.C.Code Section 41–139 provides that upon dissolution, the partnership assets include "[t]he contributions of the partners necessary for the payment of all the liabilities specified in paragraph (2) of this section." Paragraph 2 includes the "liabilities of the partnership . . . owing to the partners other than for capital and profits." This language reinforces the conclusion that the partnership has a claim for contribution against each partner for the liabilities owed to any of the partners, including that particular partner.

**26.** Offset will reduce by equal amounts the recovery and distributions made by the Trustee, presumably reducing the Trustee's commission, but this is not prejudice to the estate.

six months after both Bucheit and Bramlett had left JTA. Similarly, the Pepco claim is for service provided between 1986 and 1990. The Trustee originally argued that Bucheit and Bramlett are nonetheless liable for those claims because they did not demand that the partnership "wind up" its affairs and liquidate, but consented to its continuation as a successor partnership.

■ As set forth above, absent compliance with D.C.Code § 41–135, withdrawal from a partnership does not release a former partner from liability for the existing debts of the partnership. However, once a partner withdraws, he or she is not personally liable for the debts incurred by the partnership thereafter. In apparent recognition of this fact, the Trustee has now indicated an intent to withdraw his claim against Bramlett on account of the Pepco and M & B Ceramic Tile claims. *See* Trustee's Reply, DE # 106, p. 24. The court sees no reason why this same logic does not free Bucheit, who withdrew before Bramlett, from any liability for these two claims, and so will deny judgment against Bucheit on account of these claims.

Chandler, Harper, Buchanan and Ricciuti have raised no colorable defenses to liability under section 723 on account of the claims of M & B Ceramic Tile, Pepco or Buchanan, Ricciuti & Balog. Accordingly, judgment will be entered against Chandler, Harper, Buchanan and Ricciuti in the amount of $25,-889.91 on account of these claims, after adjustment for unvalued assets of the estate.

An appropriate order will be entered.